IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

EDDIE S. WATKINS                                                                      PLAINTIFF

            v.                        Civil No. 6:07-cv-06066

SHERIFF CHAD LEDBETTER; FORMER
LT. GRICE; SGT. MARSH; CPL.
KEVIN ABBOTT; JAILER MIKE TAYLOR;
and JAILER WILLIAM ROSS, JR.                                              DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Eddie S. Watkins, III, (hereinafter "Watkins" or "Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Jimm Larry Hendren, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

Watkins is currently incarcerated in the Arkansas Department of Correction.  The events at issue in this lawsuit occurred while Watkins was incarcerated at the Hot Spring County Jail. Watkins contends his constitutional rights were violated in the following ways while he was incarcerated there:  (1) he was subjected to unconstitutional conditions of confinement; and (2) he was denied adequate medical care.

Defendants filed a summary judgment motion (Doc. 44).  To assist Watkins in responding to the summary judgment motion, I propounded a questionnaire (Doc. 56).  Watkins filed a timely response to the questionnaire (Doc. 58).  He also filed various supplements to his response (Doc. 59, Doc. 60, Doc. 61, Doc. 62, Doc. 63).  The supplements consist primarily of documents he appears

-1-

to have obtained from Defendants in response to discovery requests.  The summary judgment motion is now ready for decision.

## 1. Background

Watkins was booked into the Hot Spring County Jail (HSCJ) on June 20, 2007, after being arrested on second degree forgery charges.  *Plaintiff's Response* (Doc. 58)(hereinafter *Resp.*) at ¶ 1. He was released on July 2, 2007.  *Id.* at ¶ 2.  He was again incarcerated at the HSCJ on July 11, 2007.  *Resp.* at ¶ 3.  He was convicted and sentenced that day to a term of imprisonment in the Arkansas Department of Correction (ADC).  *Id.* at ¶ 5.  He remained incarcerated at the HSCJ until transferred to the ADC on September 6, 2007.  *Id.*

On June 20, 2007, when Watkins was being booked in he was asked if he needed medical treatment now.  *Resp.* at ¶ 6.  He responded no but that he had taken his last medication that day, was out of medication, and needed to take medication again the morning of June 21st.  *Id.*  The following medication was listed:  Dilantin and [Carbamazepine] for seizures; [Amlodipine] for blood pressure; [Glyburide] for diabetes; and hydrocodone for lower back pain and muscle spasm.  *Id.* at ¶ 8.

On June 22nd, according to Defendants, Watkins advised an officer that the Malvern Police Department was supposed to bring his medication and had not.  *Defts' Ex.* E.  An appointment was scheduled with Watkins' doctor, Dr. Rivas, that day at 3:30 p.m.  *Id.*  At 1:45 p.m., an officer reported that Watkins asked that his appointment be canceled and stated he would take care of his own medications.  *Id.*  The report reflecting this information is signed by Watkins, the officer, and a supervisor.  *Id.*

According to Watkins, the only time he talked to an officer about the Malvern Police bringing his medication was on June 20th.  *Resp.* at ¶ 9.  Watkins indicates he told the officer that the city police officer who arrested him was going to check with Watkins' mother to see if he had any more

medication at home.  *Id.*  If Watkins did, the officer was going to bring it to the jail.  *Id.*  Watkins indicated his mother would testify he had no more medication at home.  *Id.*  Watkins states the city officer never came back.  *Id.*

Watkins indicates he was unaware of the June 22nd appointment with Dr. Rivas until he was told the jail didn't use Dr. Rivas.  *Resp.* at ¶¶ 10-12.  Further, Watkins states he did not say he would take care of his own medications.  *Id.*  He states he was told the jail would cancel the appointment with Dr. Rivas and schedule one for him with Dr. Tilley.  *Resp.* at ¶ 10.  It was only after they said that they didn't use Dr. Rivas that Watkins states he signed the paper dated June 22nd.  *Id.* at ¶ 11.

Watkins indicates he assumed he would be made an appointment with the jail's doctor the same day or the next day but it wasn't until June 27th.  *Resp.* at ¶ 12.  Watkins also states he told them he would go to their doctor as long as they were paying for it.  *Id.*  He notes that this part of the conversation wasn't "logged."  *Id.*  Watkins agreed that he signed the document dated June 22, 2007, that "summarizes" his conversations with the officer about his medication and doctor's appointment on that day.  *Id.* at ¶ 13.

On June 24th Watkins submitted a medical request form.  *Resp.* at ¶ 15.  He stated he had been without his medicine since the 20th.  *Id.*  He stated he had been having seizures, was weak, and light headed.  *Id.*

According to Watkins, he has been diagnosed with epileptic seizure disorder.  *Resp.* at ¶ 16. When he is about to have a seizure, he indicates the left side of his head starts to tingle, his vision blurs, he starts sweating, he feels weak, and then he passes out.  *Id.*  On a number of occasions, Watkins indicates he has fallen and bitten his tongue.  *Id.*  He indicates family members have told him that during the seizures he shakes badly, bites his tongue, and becomes stiff.  *Id.*  He sometimes is out for two or three minutes.  *Id.*

Watkins indicates he also has grand mal seizures. *Resp.* at ¶ 16. He can have these seizures at any time. *Id.* He indicates these seizures ordinarily last about one minute. *Id.* During the seizures, someone has to make sure he doesn't bite or choke on his tongue or fall and hit his head. *Id.* He indicates he is supposed to take anti-seizure medication on a daily basis. *Id.*

On June 24th Watkins also submitted a grievance about the conditions in A-pod. *Resp.* at ¶ 17. He complained there was no running water, no fire escape plan or fire extinguishers, loose hanging live wires close to the cells, the toilet only flushed half way, the trustees served the food with their bare hands, the shower only had scalding hot water and no cold water, he could only obtain drinking water by hollering for a trustee to bring it and it sometimes took thirty minutes or longer, and it was brought in a water jug and poured through a gasoline funnel held through the bars. *Id.*

On June 25th Watkins submitted another medical request. *Resp.* at ¶ 18. He stated he was still out of his medication. *Id.* On June 27th Watkins submitted a grievance form about being out of medication since the 20th. *Resp.* at ¶ 19. He indicated he had been told a doctor's appointment would be made. *Id.* On the 27th he stated he had gotten sicker and was throwing up and coughing up blood. *Id.* He stated the paramedics were called but Paramedic Sheffield verbally told him the lieutenant had instructed Sheffield not to transport Watkins to the hospital. *Id.* at ¶ 20. Watkins said he had been without his medications for a week, was ill and hadn't been taken to the doctor or emergency room, and his family didn't know about his illness. *Id.* at ¶ 21. Watkins states he did not receive any treatment that day. *Id.* at ¶ 22.

However, on June 28th Watkins submitted a grievance and mentioned "PA Costello". *Resp.* at ¶ 23. When asked by the Court to explain who Costello was Watkins responded as follows:

> PA Costello is the physician assistant to Dr. Tilley.  Once I was finally taken to the
> Defts' doctor this is whom I saw and he refilled all my meds.  Also put me on a
> Diabetic Diet and told Deputy Abbot to take me to the Emergency Room so they
> could give me some bags for me to take some of my feicies to put in the bag for them
> to bring a sample back to the Emergency Room each day for tests to be done due to
> me coughing up blood prior "To No Avail" they never gave me the bags nor took my
> sample of feicies bac to be tested.

*Resp.* at ¶ 22.  *See also Resp.* at ¶ 11(I went to their doctor on June 26th and started medication on June 27th).  He stated PA Costello informed Deputy Abbott that he needed to be on a 2100 calorie diabetic diet.  *Id.*  He stated he was told that Sgt. Marsh, Mr. Abbott, and Lt. Grice would get together on the morning of the 28th and discuss his medical situation and diet.  *Id.*

Watkins maintains he did not receive the 2100 calorie diabetic diet.  *Resp.* at ¶ 24.   In fact, he states that Sgt. Marsh, Deputy Abbott, and Deputy Taylor told the officers to feed him the same as everyone else was receiving.  *Id.*  Instead of being furnished with a diabetic diet, Watkins states he was just given extra food but the same food everybody else ate.  *Resp.* at ¶ 28(A).  He indicates he had no choice but to eat the food.  *Id.*  Watkins asserts the trustees served the food with their bare hands.  *Resp.* at ¶ 28(B).  He states they touched the food and then served it on Styrofoam trays without lids.  *Id.*  Watkins states the food would sit in the open uncovered while all trays were fixed. *Id.*  He doesn't know if he has suffered any health problems because of the manner in which the meals were prepared or served.  *Id.*

Watkins began receiving his prescription medications on June 27th and continued receiving them while incarcerated at the HSCJ until his transfer to the ADC.  *Resp.* at ¶ 25.  He submitted no medical requests after June 28th.  *Id.* at ¶ 26.  He submitted no grievances about medical issues after June 28th.  *Id.*

He had adequate clothing. *Resp.* at ¶ 29.  He had a mattress to sleep on although there were a lot of times the mattresses were torn up and extra blankets had to be used due to the dents and holes in the thin "tin like" bunks. *Id.* at ¶ 30.

There were times Watkins had to wait thirty minutes or even an hour for something to drink. *Resp.* at ¶ 31(A).  The cells did not have running water and the trustees brought drinking water to the cells in a water jug and poured it through the bars using a funnel. *Id.   See* Doc. 59 at page 14 (Sheriff Ledbetter's response to interrogatory 16–the water fountain above the toilet does not work). Because he is a diabetic, Watkins indicates he stays thirsty a lot. *Resp.* at ¶ 31(A)*.*

Watkins maintains the Criminal Detention Facility Review Commission general housing requirements provide that drinking water must be available without staff assistance. *Resp.* at ¶ 31(B).  He further states the cells are supposed to have a toilet above floor level, a wash basin, and hot and cold running water. *Id.*  He asserts they did not have these in the cell he was assigned to. *Id.*

Watkins states he knows the jail had no fire escape plan or fire extinguishers because he asked Deputy M. Taylor during casual verbal conversation. *Resp.* at ¶ 32.  He additionally states there are no smoke detectors, no sprinkler system, and combustible materials stored in plain view. *Id.*

Watkins maintains there are loose live wires hanging close to the cells. *Resp.* at ¶ 33.  He was asked to describe these wires. *Id.*  He indicates the wires are in the living and activity area and he does not know what the wires are. *Id.*  He only knows they run across the "across the 3 ½ foot eisle up the top of the cell within reaching distance of any inmate." *Id.*  He indicates the wires have

been hanging like that for years.  *Id.*  He does not know of anyone who has been injured by the wires.  *Id.*

Watkins indicates the toilet only half flushes as a result of plumbing problems in the jail.  *Resp.* at ¶ 34.  The problems have not been repaired.  *Id.*  Watkins does not know if he has suffered any health problems as a result of the problems with the toilet.  *Id.*  He indicates that is yet to be determined.  *Id.*

The cell Watkins was assigned to was ten foot by sixteen foot in size.  *Resp.* at ¶ 35.  There was a toilet and a shower that had to be turned on from outside the cell.  *Id.*  There were eight bunks and a table.  *Id.*  Watkins asserts he was locked down twenty-four hours a day, seven days a week.  *Id.*  *See also* Doc. 59 at page 13 (Sheriff Ledbetter's response to interrogatory No. 12–Inmates are locked up 7 days a week 24 hours a day).

Watkins states he had no access to a day-room or any area large enough to do any type of exercises.  *Resp.* at ¶ 36.  *See also* Doc. 59 at page 13 (Sheriff Ledbetter's response to interrogatory No. 13–no outside exercise).  Because he had diabetes, Watkins states it is particularly important that he be able to exercise.  *Resp.* at ¶ 36.  Since he was unable to exercise, Watkins indicates he was placed on more pain medication due to his right knee and lower back problems.  *Id.*  Additionally, he states his arthritis in his joints has worsened and he has had more problems with his knee and feet swelling.  *Id.*  He indicates he has now been given right and left knee braces by the ADC medical staff.

Watkins believes he was exposed to lead paint and asbestos at the HSCJ.  *Resp.* at ¶ 37.  He points out the jail was built in 1936.  *Id.*  He asserts their failure to have the jail tested for the presence of these substances amounts to recklessness on their parts.  *Id.*

-7-

On two separate occasions Watkins maintains mentally unstable inmates were placed in the cell with him. *Resp.* at ¶ 44. First, he indicates Ronald Tippens was placed in the cell with him from June 22, 2007, until August 30, 2007. *Id.* Watkins indicates he had three or four confrontations with Tippens. *Id.* Tippens threatened to f— him and other inmates while they slept. *Id.* Watkins reported this to Taylor, Ross, Marsh, and Abbott and asked them to move Tippens but they merely responded he was not going to hurt anybody. *Id.* Second, Watkins indicates Daniel Edmonson was placed in his cell on August 10th. *Id.* Watkins indicates Edmonson threatened him and other inmates. *Id.* On August 16th, Watkins states Edmonson was placed on suicide watch. *Id.*

Watkins objects to the fact that the HSCJ does not test inmates for tuberculosis (TB) when they come into the jail. *Resp.* at ¶ 45. He also states there are no TB lights. *Id.* He does not know if he came into contact with TB at the HSCJ or not. *Id.* Watkins indicates he has not been tested for TB since he left the jail on September 6, 2007. *Id.*

Watkins did not personally speak to, or communicate with, Sheriff Ledbetter about his need for medical care or about his complaints about the conditions he was housed under. *Resp.* at ¶ 38. However, he states he was verbally informed by Abbott, Marsh, and Ross that the Sheriff was well aware of his medical complaints and by the Sheriff's own responses to interrogatories he was aware of the conditions of the jail. *Id.* Furthermore, Watkins points out that the Sheriff's name is on the Detention Center Compliance Reports. *Id.*

## 2. Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

Defendants have now moved for summary judgment.  Defendants deny they engaged in any conduct that resulted in Watkins' constitutional rights being violated.  First, Defendants argue that Watkins cannot prove that he was subjected to unconstitutional conditions of confinement.  Second, Defendants contend Watkins was not denied adequate medical care.

Watkins argues that there is overwhelming evidence that he was subjected to overcrowded conditions, locked down in a cell twenty-four hours a day, seven days a week, not given opportunities for exercise, denied ready access to drinking water, subjected to unclean and unhealthy conditions, in imminent danger and otherwise exposed to unconstitutional conditions of confinement.  With respect to his denial of medical care claim, he maintains the Defendants exhibited deliberate indifference when they delayed in obtaining his prescription medications when

he was initially incarcerated and also delayed in providing him treatment when he became ill on June 27th.

### A.  Conditions of Confinement

 "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.  *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at

-10-

875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Keeping these principles in mind, I turn to an examination of the conditions of confinement alleged to exist in this case.  Watkins has identified numerous inadequacies in the conditions under which he was confined.  Among the conditions he claims violated his rights are the lack of exercise. In this regard, the cases have held that a constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs.  *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).  A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Id.*  Among factors the court should consider in reviewing such a claim are:  (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement.  *Id.*  There are clearly genuine issues of fact as to whether Watkins was subject to unconstitutional conditions of confinement.  Here, Watkins indicates he was locked down in his cell twenty-four hours a day seven days a week.  This assertion is supported with interrogatory responses from Sheriff Ledbetter. Moreover, the jail inspection reports also indicate that there are no areas for inmate exercise.

Watkins also asserts that the conditions in the jail were overcrowded, the jail was poorly maintained, and the plumbing did not work properly.  Under relevant case law, the court is to focus on Watkins' exposure to such conditions and how unsanitary the conditions were.  *See Hutto v. Finney*, 437 U.S. 678, 686-87, 98 S. Ct. 2565, 57 L. Ed. 522 (1978)(filthy, overcrowded cell might

"be tolerable for a few days and intolerably cruel for weeks or months); *Smith v. Copeland*, 87 F.3d 265, 267 (8th Cir. 1996)(court reviews the totality of the circumstances of the inmate's confinement); *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994)(length of time required for conditions to be unconstitutional decreases as level of filthiness increases).

Watkins submitted as one of his exhibits Sheriff Ledbetter's responses to interrogatories and requests for production of documents which includes jail inspection reports or the summary of jail inspection reports.   *See e.g.,* Doc. 59.   Following the jail inspections on May 16, 2007, and November 16, 2007, the Hot Spring County Judge was notified that major problems were identified in the following areas:  inmate overcrowding; insufficient staff; exercise; inmate separation; cell design; visitation; emergency power; secure booking; and storage and staff.  Doc. 59 at pages 36-37 & pages 47-48.[1]   Note was made that the jail was designed to hold nine inmates and was holding an average of thirty-two inmates per day.  *Id.* at pages 36 & 47.  The letter indicates there is insufficient space for exercise areas and that this impacts the health of inmates and increases the cost of medical bills for the county.  *Id.* at pages 36 & 48.  The letter notes that the HSCJ was being kept on six months notice when a formal re-inspection will be done.  *Id.* at page 37 & 48.

Other jail inspection reports indicate these same shortcomings were noted prior to Watkins' incarceration at the HSCJ.  *See e.g.,* Doc. 59 at pages 55-56 (jail inspection on April 11, 2006); Doc. 60 at pages 1-2 (jail inspection on November 15, 2006).  In fact, the conditions had existed for an extended period of time.  On the Detention Facility Compliance Report for the inspection date of April 5, 2005, the following notation appears: "This Jail is chronically overcrowded & is completely

---

[1]Unfortunately Plaintiff used a highlighter or some type of marker on these pages.  As a result, when the pages were scanned into the Case Management/Electronic Case Files (CM/ECF) database the markings made portions of the pages virtually illegible.  The same is true for many of the exhibits submitted by the Plaintiff in response to the summary judgment motion.

inadequate and dangerous." Doc. 60 at page 33 (emphasis in original).  Given the fact that Watkins

was incarcerated at the HSCJ from July 11, 2007, to September 6, 2007, and these conditions are

alleged to have persisted throughout his incarceration there, I believe genuine issues of material fact

preclude summary judgment in Defendants' favor on Watkins' unconstitutional conditions of

confinement claims.

### B.  Denial of Medical Care

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and

general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L.

Ed. 2d 1043 (1998)(citation omitted).  "Deliberate indifference to an inmate's serious medical needs

violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield*

*v. Colburn*, 491 F.3d 394, 396 (8th Cir.  2007).  In this circuit it is now settled law that deliberate

indifference is the appropriate standard of culpability for all claims that detention center officials

have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v.*

*Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S.

97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both

an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered

[from] objectively serious medical needs and (2) that the prison officials actually knew of but

deliberately disregarded those needs.'"  *Jolly  v.  Knudsen*, 205 F.3d 1094, 1096 (8th Cir.

2000)(*quoting  Dulany  v.  Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).  "For a claim of

deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

As Defendants' point out, Watkins' denial of medical care claim centers on his first incarceration at the HSCJ from June 20, 2007, until July 2, 2007. Watkins maintains the Defendants failed to obtain his prescription medications for him in a timely manner and did not provide proper medical treatment for him after he became ill on June 27th. It does appear that Watkins went without his prescription medications from June 21st, the first day he said he needed them, until June 26th. On June 22nd a doctor's appointment was scheduled for Watkins with his own medical doctor, Dr. Rivas. *Defts' Ex.* E. This appointment was later canceled with Watkins' agreement. *Defts' Ex.* E.

There appears to have been some misunderstanding or mis-communication between the parties at this stage. The document prepared by Defendants and signed by Watkins indicates Watkins requested that the doctor's appointment be canceled and that he would be taking care of obtaining his own medication. *Defts' Ex.* E. Despite the language of the document and his signature

-14-

on it, Watkins states he did not ask for the appointment to be canceled or even know about the appointment until he was informed the jail did not use Dr. Rivas. *Resp.* at ¶¶ 10-12. At that point, he understood the appointment would be made with the jail's doctor and Defendants would be paying for it. *Resp.* at ¶ 12. According to Watkins, he told them: "I'll go to their doctor as long as they was paying for it, sure I'll see they doctor." *Id.*

Watkins did see the jail's doctor, or his physician's assistant, four days later. *Resp.* at ¶¶ 11 & 12. Watkins began receiving his prescription medications by June 27th and received them throughout his second incarceration at the HSCJ until his transfer to ADC. *Resp.* at ¶ 25. He submitted no medical requests after June 28th and no grievances about medical issues after June 28th. *Resp.* at ¶¶ 26-27.

I do not believe the mis-communication or misunderstanding between the parties on June 22nd is evidence of deliberate indifference on the Defendants' part. *See e.g., Bender v. Regier*, 385 F.3d 1133, 1138 (8th Cir. 2004)(inadvertent failure to provide adequate medical care is not a constitutional violation; mis-communication about the ordering of a given treatment is at most evidence of negligence). There is simply no evidence that Defendants ignored an acute or escalating situation with respect to Watkins' health. *See Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997). Watkins has submitted no medical evidence suggesting his health suffered as a result of not receiving his prescription medication between June 21st and June 27th or that his illness on June 27th was related to his not receiving his prescription medication. *See Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)("An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs."). Following his treatment by the paramedic on June 27th and Watkins regular

receipt of prescription medication, he submitted no further medical requests or complaints about his medical condition or medical treatment.  I believe Defendants are entitled to summary judgment on this claim.

### 4. Conclusion

For the reasons stated, I  recommend that the Defendants' motion for summary judgment (Doc. 44) be granted in part and denied in part.  Specifically, I recommend the motion be granted with respect to Plaintiff's denial of medical care claim.  I recommend the motion be denied  with respect to Plaintiff's claims that he was subjected to unconstitutional conditions of confinement.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this 17th **day of February 2009.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE