IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


EDDIE S. WATKINS                                                    PLAINTIFF


         v.                    Civil No. 6:07-cv-06066


FORMER SHERIFF CHAD LEDBETTER, in his                              DEFENDANTS
individual capacity; FORMER LT. GRICE,
in his individual capacity; SGT. MARSH, in
his individual capacity; CPL. KEVIN ABBOTT,
in his individual capacity; JAILER MIKE TAYLOR,
in his individual capacity; JAILER WILLIAM ROSS, JR.,
in his individual capacity; and SHERIFF RYAN BURRIS,
in his official capacity

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Eddie S. Watkins, III (hereinafter Watkins), filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Watkins is currently incarcerated in the Arkansas Department of Correction.  The events at issue in this lawsuit occurred when he was incarcerated at the Hot Spring County Jail.  Watkins contends his constitutional rights were violated by the conditions under which he was confined at the jail.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Jimm Larry Hendren, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.  On June 17, 2009, an evidentiary hearing was held.  At the conclusion of the hearing, the case was taken under advisement pending preparation of this report and recommendation.

## 1. Background & Evidence Presented

Watkins was booked into the HSCJ on June 20, 2007, he remained incarcerated there until July 2, 2007, when he was released. *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 2. He was next booked into the HSCJ on July 11, 2007. *Plff's Ex.* 3. He remained incarcerated there until September 6, 2007, when he was transferred to the Arkansas Department of Correction (ADC). *Id.*

At the evidentiary hearing, I heard the testimony of the following witnesses: (1) Eddie Watkins; (2) County Judge Bill Scrimshire; (3) George McGuire; (4) Robert McCauley; (5) Kimzey Harper; (6) Richard Harper; (7) Whitney Bishop; (8) Robert Marsh; (9) Ray Bailey; (10) Kevin Abbott; and (11) Mike Taylor. For purposes of discussion, I will summarize in the first person the testimony given at the evidentiary hearing. The testimony will not necessarily be summarized in the order given by the witness.

***Eddie Watkins***

I'm currently incarcerated in the Randall L. Williams Unit of the Arkansas Department of Correction (ADC). I'm forty-five years old. I have five or six felony convictions. I have one robbery conviction and the rest of the convictions are mainly for forgeries, theft of property, and commercial burglary.

I was arrested and placed in the Hot Spring County Jail (HSCJ) on June 20, 2007, and remained in custody until July 2, 2007. On July 11, 2007, I accepted a plea on a charge of forgery in the second degree and received a sentence to the ADC. I was incarcerated at the HSCJ from July 11, 2007, until September 6, 2007. It is the June incarceration I am complaining about.

The jail was divided by a hall into two sides–A side and B side. I was placed in the A side. The A side had eight beds, one shower, and a toilet. There was no running water. *See* Doc. 59 at

-2-

page 14; *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 1 at page 1.  The jail was built in 1936.  There was

no fire escape plan.  At the back door of the jail, there was a fire ladder.  It doesn't go all the way to

the ground.

There was no room for exercise.  I have diabetes; with diabetes you need exercise.  By Sheriff

Ledbetter's own admission we were locked up seven days a week twenty-four hours a day.  Doc. 59,

answer to #12 at page 13; *Plff's Ex.* 6 at page 2.  The jail was only supposed to hold nine.  The

majority of the time there were over nine inmates.  At one time, there were thirty-two inmates.  It

was crowded.  Some on the detainees had blue plastic mats and slept on the floor.  There were eight

beds mounted to the wall.  There were at least sixteen beds but I can only speak for the side I was

on.

I always had a mattress.  It was unsanitized and had a hole in it.  The plumbing was stopped

up frequently.  They would have us try to unstop it.  One day it was stopped up for seven or eight

hours.

We had access to a room that had a long bench we sat on to eat and watch television.  Every

where you turned there were guys.  It was too crowded at all times.  It was too filthy.

Mainly there was one officer on duty.  When the officer came on duty, he had to unlock the

door leading to the cells.  It had a padlock and then you had to rotate the lock.  It took two officers

to unlock door.  Taylor said he had to wait for officers to come off the street.  There were no fire

extinguishers.  There were loose wires hanging.  *Plff's Ex.* 1 at page 6.  There was an air conditioning

unit on each side of the jail.

The toilet on A side only half flushed.  Sheriff Ledbetter admitted this in answers to

interrogatories.  The floor drain was clogged and never opened.

I showered every other day.  The inmate trustees (hereinafter referred to as "309's"[1]) had to go back in and turn the water on for the shower.  There was only scalding hot water when it was turned on.  The water was so hot I just got a towel and wet it down and really just got washed up.  You couldn't really get up in there with scalding hot water.

McGuire was a 309 inmate.  He prepared food.  There was a cracked window where flies came in.  The food was served on Styrofoam trays without lids.  The food was served to us through a hole cut in the bars.  It was served over an open trash can.  We had to place our cups on nasty filthy bars for the trustees to pour our juice into.

I'm a diabetic so I'm thirsty a lot.  *Plff's Ex.* 17 (DM–diabetes mellitus).  *See also Plff's Ex.* 16.  You had to ask for water.  Sometimes when I asked for water, I had to wait up to thirty minutes.  Sometimes I got the shakes because I didn't have water.  The water was brought in a jug and poured through a gas funnel.  *Plff's Ex.* 1 at pages 4-5.

I filed a grievance on the conditions in the jail.  *Plff's Ex.* 13.  I never received a response.  I asked Mr. Marsh, the jail administrator.  I asked if Sheriff Ledbetter was aware of it.  They said Sheriff Ledbetter was aware of the conditions of the jail.  I was assured the Sheriff knew of the conditions.  Prior to the Sheriff taking office, he must have been aware of the conditions.  The jail had been written up a number of times by the Jail Inspection Committee because of all these problems.  Each day when he came to work, he made rounds.  The jail was written up again in November of 2007.  *Plff's Ex.* 6.

---

[1] Act 309 of 1983 as amended is an inmate program operated by the Arkansas Department of Correction.  The Director of the Department of Correction signs cooperative agreements with county and city officials for the purpose of providing additional space for the care and custody of State inmates on a temporary basis in detention facilities operated by counties and cities.  The inmates may be used to work in and around governmental property/projects while under supervision of the sheriff or chief of police or designee.

I got taken to the doctor.  He put me on a diet due to my diabetes.  It was a 2100 calorie diet. *Plff's Ex.* 16.  Dr. Costello just wrote that I should be on an ADA diet.  ADA stands for the American Diabetic Association diet.  I don't know exactly what he meant by diabetic diet.

The jail was not equipped to handle the diet.  It has a set menu and no dietician.  They gave me food.  I was served three meals a day.  After I was put on the diet, I received the same amount of food.  I have no proof it was 2100 calories a day.  They have no proof it was.  I have no idea if the individuals who worked at the jail received the same food.  Marsh said whatever they were feeding I had to eat it.  They knew of my medical condition because I told them when I was booked in.

I have no medical evidence showing I suffered any injury because of the conditions I was made to live in.  I have not been thoroughly examined.  I could have been exposed to tuberculosis (TB), lead paint, asbestos, etc.  I haven't been tested for exposure to any of those.  I was also put in danger because of the lack of a fire escape plan.

I coughed up blood and the paramedics came.  I was not taken to the hospital.  I have diabetes and take two medications for seizures and high blood pressure.  I don't know if the throwing up blood was related to the conditions under which I was housed.  I was not taken to the doctor.

I had problems with my knees because of the lack of exercise and excess weight I gained.  I was given knee braces by the ADC right after I got there.

I was in danger when I was incarcerated with two mental health patients, Tippens and Edmonson.  Tippens said:  "I'm going to f— you up."  I was told Tippens and Edmonson were just running at the mouth.

A jailer doesn't have the ability to build a jail.  Defendants worked at the jail.  They had other options.  They could have sent inmates to other jails.  Personally, I would have gone to my boss and complained about the conditions or quit.  They personally knowingly placed me in unsanitary and unsafe living conditions.

I never refused an opportunity to go to another detention center.  Marsh didn't offer me an opportunity to go to the Dallas County Detention Center.  My parents drive a great deal.  In 1996 I did thirty days.  Kevin Abbott never offered me a transfer to Sheridan.  I never asked for a transfer to another facility it was out of my control.  I had one conversation with Taylor asking him to get me out of there.  I was never moved or offered an opportunity to move.

I weighed 175 when booked into the HSCJ and now I weigh 214.  I put on weight while in the HSCJ.  With no exercise, you would put on weight.

### Hot Spring County Judge Bill Scrimshire

I'm the current County Judge.  I have served in that capacity since 2005.  I was County Judge when Watkins was incarcerated there.  I was aware of the conditions in the old jail.

There were some deficiencies and overcrowding at times.  We resolved the overcrowding by cutting the population down.  There was no outside exercise.  The Sheriff in office prior to Sheriff Ledbetter got the population down.  He farmed the detainees out to other jails.  The jail may have been overcrowded on occasion.  I was not aware of any fire hazards.

It is not my duty to oversee the county jail.  I received reports from the Criminal Detention Facilities Review Committee.  I would have to refer to them to remember all the data.  As problems presented themselves, we did the best we could to correct deficiencies.  We had a plumbing company in Malvern who responded quickly.

I recall receiving the report of the jail inspection that took place on November 16, 2007. *Plff's Ex.* 6. About this time we were getting ready to build a new jail. We could see the light at the end of the tunnel.

The old jail was out of compliance when I became the County Judge. We finally got the funds to build a new county jail. According to these reports, there were some deficiencies. Prior to January 1, 2005, I didn't receive the reports. I didn't look at past reports. We did our best to correct the deficiencies we could. There were insufficient funds to completely renovate the old jail and build a new one.

I ate quite a bit of food prepared in the jail. The food was prepared by 309 inmates. Two and a half months ago the new jail opened. The old jail was shut down. The new jail is in compliance with all standards.

### George McGuire, III

I'm incarcerated in the Wrightsville Unit of the ADC. I'm currently doing time for robbery. I'm doing five years. I have felony convictions for robbery, failure to appear, and theft of property.

I knew Watkins because he was in HSCJ. I knew he filed a lawsuit because he told me was going to file the lawsuit while I was in the HSCJ.

I was a 309 inmate at the HSCJ while Watkins was there. I was there from June of 2007 until October of 2007.

A 309 trustee is a person who is serving time in the ADC. I was allowed to go to HSCJ by maintaining class and meeting certain other criteria. A false accusation sent me back to the ADC. Bill Terry sent be back to the ADC. He claimed that I had been doing something in the nature of hanging out with unauthorized females.

Plaintiff's Exhibit 5 is a close resemblance to the jail.  There was an A side and a B side of the jail.  Each side had a cell with four bunk beds in it.  Each side had an eating area.  I never saw inmates exercising.  I couldn't agree that the area was big enough to do exercises.  There were usually twelve inmates on the one side and up to fourteen on the other side.  I believe at one time there were twenty-three inmates while Watkins was in the jail.  I think this was during July or August of 2007.

My job was to cook, clean, do laundry for the inmates, anything they required of me.  Sgt. Marsh was the jail administrator.  All inmates were served three meals a day.  Sometimes the jail administrator ate the same food.  Clean utensils were used.  But the jail was just not sanitary.  There were flies coming in and out.  The food was served on Styrofoam trays.  They didn't provide any safety nets to make sure the food was served property.   The paint was peeling off the bars where you slid the food through.

I didn't clean the inmates' shower.  The inmates cleaned their own shower.  There was no cold water.  There was one knob and the water was scalding hot when the inmates took a shower. I went in there and couldn't stick my hand under the water.  The inmates couldn't actually physically be in the shower.  They just stuck their towel in there.

There was supposed to be a fire escape but it was blocked.  They had to have two officers to open the door leading to the jail.  Corporal Abbott and I believe Marsh told me that the door couldn't be opened without two officers present.

There was an air conditioner on each side.  The windows were not allowed to be open.  The jailers thought the inmates would scream out to the public downstairs.

-8-

The first time Watkins got sick, he asked me to get an officer.  Officer Taylor was on duty.  I informed Taylor that Watkins was sick.  Taylor said he was busy.  He wasn't busy.  He was smoking a cigarette and playing a card game on the computer.  If you consider that busy.

There was no outside exercise.  The jail cells were flooded several times.  I know for sure the flooding was caused twice by the toilet.  Twice it was that way overnight before it was fixed.  The 309's would have to clean it up.  I can't agree that the plumbing problems were always fixed.  Both A and B cells were flooded for two days.

### Robert Franklin McCauley

I live in Malvern.  On August 9, 2007, I was locked up in the HSCJ.  I was at the HSCJ for thirty-one days.  I was incarcerated on a second degree battery charge.  This was my only felony.  I had misdemeanor charges against me when I was younger.  I served eleven months in the ADC.

The jail was condemned.  It was unbearable.  There was no control of the climate. There was one window air conditioner on our side.  I could not see whether the other side had an air conditioner or not.  The 309's controlled the air conditioner.

There were four bunk beds.  I always had a mattress.  We had access to an eating room or day-room.  I could move about but only about ten feet.  I never saw anyone do any exercise.  There wasn't room if anyone was at the table.  If you were by yourself, you could exercise.  I tried to exercise but it was too crowded.  I recall Watkins having bad knees and a bad back.  I don't recall Watkins trying to exercise.

Water was brought when they wanted to.  One time my wife had to call Sheriff Ledbetter to get water to me.  A 309 then brought the water.  Water was served through the bars in an oil funnel.

-9-

There was no running water.  There was asbestos in the ceiling and in the wrapped pipes.  I know what it looks like.  I've dealt with it most of my life.

I sometimes got three meals a day.  Sometimes I only got two meals a day.  I gave mine away.

I cleaned the cell one time.  Another prisoner flooded it.  There were opportunities to clean the shower but not on a regular basis.  We were given a broom and a mop by the 309's when they wanted to.

If you needed to see a doctor, it took a week if you even got to see a doctor.  Every once and awhile I would get a clean towel to take a shower.  You got to take two showers a week–jump showers.  The water was scalding hot right out of the tap.  It was so hot you could cook a pork chop in it.  I got clean clothes every once and awhile.  I've seen dogs live better than that.

The plumbing would get stopped up.  I never saw a plumber.

There were no TB lights and no testing for TB.

I recall Watkins being asked to go to Dallas County.  It seemed like there was a big uproar about that.  I just vaguely remember him having trouble about it.  I don't really recall.  When you are in jail, you stay by yourself.

I gave Watkins an affidavit.  I didn't talk to him about what I was going to say in it.  He asked me if I could provide an affidavit.  I was released from the ADC on September 26, 2008.

### *Kimzey Harper*

I was incarcerated in the HSCJ for three weeks in 2007.  I was there for one week during the last part of June of 2007 then went to another facility.  I returned to the HSCJ during the last part of July.  I have three felony convictions.

Watkins and I were at the same unit in the ADC.  I knew about the lawsuit when I was at the HSCJ.  I believe I filled out the affidavit in June or July of 2007.  The date on the affidavit, September 28, 2007, is incorrect.  I was in the penitentiary then.  I don't remember doing it while I was at the penitentiary but I did one while I was at the county jail.

Watkins didn't tell me what to put on the affidavit.  I don't know if I gave the affidavit back to Watkins or handed it to one of the jailers.

The cells had four bunk beds on each side.  I always had a mattress.  We had access to the day-room.  I saw people exercising–doing jumping jacks, etc.  I didn't exercise but could have.  I didn't see Watkins exercising.

The plumbing was stopped up.  The drain in the shower was usually messed up; it ran over to where the toilet was.  We would throw clothes on the water.  By the end of the day, it would remedy itself.  It would eventually drain.  I never saw a plumber.

We received three meals a day.  There was no running water.  You had to get drinking water through the bars.  You asked for water and eventually you would get it–sometime that day.  I remember waiting a lot longer than thirty minutes for water.

The shower had scalding hot water.  You had to just jump in and out of it.  The water was hot enough to burn.  Everyone talked about how hot it was.  We didn't really have an opportunity to clean the shower.  Other than water running in it while we were taking a shower.

### Richard Harper

I was incarcerated at the HSCJ from June 7, 2007, to the end of July 2007.  I have two felony convictions for manufacturing methamphetamine.  I was never incarcerated with Watkins at the HSCJ.  I was in prison with Watkins.

-11-

There was an A and B side of the jail.  There were eight beds on each side.  There was access to a day-room.  You probably could do sit-ups or pull-ups if you didn't mind getting on the dirty floor.  I never saw anyone doing exercises.

There was no running water in the jail.  They brought us drinking water in milk jugs and poured it through the bars using a funnel.

There were people sleeping on the floor.  A lot of peeling paint.  I filled out a sick call slip and never got medical attention.

The water backed up a few times.  I don't know why.  It came up through the floor.  When it backed up, the water would get cleaned up.

We  were served three meals a day.  The food was served without gloves, or nets, or lids.  I don't know if it was prepared in a sanitary fashion.

It was only very seldom that we got a broom or mop to clean the cell with.  I never saw the Defendants letting the 309's in to help clean up.

There was an air conditioning unit.  However, it was always hot in there.

Every other day, I showered.  I washed my hair and body.  I maybe took three or four minutes.  The water was either too cold or too hot.

I submitted an affidavit.  Watkins asked me to write one.  I gave it to him in prison.

### *Whitney Bishop*

I'm incarcerated in the Ouachita River Unit of the ADC.  I was incarcerated at the HSCJ in June and July of 2007.  I was there on a rape charge.  I was incarcerated with Watkins.  I knew Watkins through my parents.  I had known him for about one and one-half years.  In December of 2007, Watkins told me he was planning on filing this lawsuit.

-12-

The jail was filthy.  The paint was peeling off the walls.  There was no running water.  Drinking water was poured through the bars.

I was throwing up.  Plumbing was backing up.  The toilets were overflowing.  Marsh said they were going to call some people but they never came out.  I never saw a plumber.

There were wires holding up the shower curtain.  Windows were broken out.  There were people sleeping on the floor.  There were eighteen or nineteen people on A and B side.

When I was on A side, I was sleeping on the floor.  I don't specifically recall the dates I slept on the floor.  They gave you this little boat thing.  It was in the middle of my incarceration.

You could shower every other day.  The water in the shower was scalding hot.  You just couldn't stand there.  If the 309's tried to turn it down, it was too cold.  When it first came on, it wasn't that hot but that didn't last very long.

We had access to the day-room.  I wouldn't say you could exercise.  The paint was peeling, the floor was dirty, and there was not enough room for exercising.  They had people sleeping on the floor with beds in there.  So who would want to do it.

I always got three meals a day.  There were air conditioning units on both sides of the jail.  I didn't suffer any physical injury as a result of the conditions.

When they get ready to ship you to another facility, they don't ask you they just ship you.

**Robert Marsh**

I was assistant jail administrator until July 22, 2007.  On July 22, 2007, I took over as jail administrator.  The new county jail is a fifty bed facility with four pods.

I interacted with Watkins a couple of times.  Nine to thirteen or fourteen detainees was the average number of detainees in the HSCJ when Watkins was incarcerated there.  We also had

-13-

detainees housed in other jails in Dallas, Sheridan and Miller Counties. Once detainees are sentenced to the ADC or if their court date was far enough out, we sent them to another facility. We paid the other facilities to house the detainees.

The jail had two main pods. Each side had eight beds. There were two lock-down cells and a drunk tank. Some detainees may have been on the floor while Watkins was there. The temporary beds are five or six inches off the floor and mattresses are put inside them. Some people refer to them as boats.

Plaintiff's Exhibit 4 are the jail logs for the time periods when Watkins was incarcerated at the HSCJ. At the bottom of the the logs for each day, it show the number of inmates in other jails, the number of trustees, inmates in our facility, and the total number of inmates.

Watkins was never moved to another facility. I went around and spoke to him through the bars. He had been complaining about not getting out. I told him we could move him to Sheridan where they were letting people out. He said that if we did that he wouldn't have any visitors.

Inmates had access to the day-room. Anyone wanting to do exercises could do them there. I saw people doing sit-ups, push-ups, etc.

There was a window air on each side of the jail. You could control the temperature quite comfortably. The windows were not supposed to be opened but there were occasions when they were open.

Water was brought to the inmates in gallon jugs. It was poured from one to the other by using a funnel. When the inmates ran out they called for additional water. If the 309's were there, they responded. If they were busy, the inmates might wait for awhile.

-14-

The set of stairs by the booking office had a fire escape.  Each cell had a bathroom in it.  The toilet worked.  The wash basin did not.  The plumbing would get stopped up.  Usually this happened because an inmate put something down the drain.  The 309's would try to unstop it.  If they couldn't, we called Wright's Plumbing out of Malvern.

The jail was right above the circuit courtroom.  The loose wires Watkins referred to were camera wires.  They were not uninsulated wires.

The majority of the time of the time the jail administrator made the decisions regarding transport.  I have transferred inmates without asking them.  In Watkins' case we were just getting his medical situation straightened out.

He never complained to me about being in the jail.  When I asked if he wanted to go to another facility, he made it clear he didn't want to leave the jail.  I was not aware of the grievance he had filed on July 24th.  *See* Doc. 3 at page 18.  On July 24th, I had just taken over as jail administrator.

The 309's turned the water on and regulated the temperature of the showers.  In the years I worked in the jail no one complained to me about the temperature of the shower.

I was never made aware of any threats against Watkins.

**Ray E. Bailey**

I'm a self-employed contractor.  I've been building for thirty years.  I was contacted to draw the old jail.

I made the diagram that is Plaintiff's Exhibit 5.  One-eighth of an inch is equal to one foot.  I walked through the jail and sketched it.  The bunks are double bunks.  The rooms with the tables in them are sixteen feet by eleven feet and the table takes up most of the area.  You could sit there

and look through the bars.  There was a TV in the entry.  Apparently the inmates could watch the TV through the bars.  The elevator was added in the 1980's.  I don't remember seeing drains.

**Kevin Abbott**

I worked at the HSCJ in June and July of 2007.  Prior to July 24, 2007, I was a transport officer.  After July 24th, I was assistant jail administrator.

I recall Watkins.  He knew my brother prior to his incarceration.

I don't recall anyone sleeping on the floor.  There was always something to sleep on.

The inmates were given water in one gallon jugs.  They were promptly given water anytime they requested it.

I saw inmates exercising numerous times.  I saw them walking around the picnic table, doing sit-ups, and push-ups.

There was air conditioning on both sides of the jail.  There was also an air conditioner in the 309 area.

Inmates were served three meals a day.  The equipment was sanitized.

I know there were cleaning supplies.  I took the 309's to the stores to purchase soap and other cleaning supplies.

The jail was pretty clean.  The 309's did a pretty good job.

The plumbing was only stopped up when the inmates did it.  Wright Plumbing would be called.

Inmates were offered showers every other day.  I never received one complaint in five and one-half years about the temperature of the shower whether it was hot or cold.  I personally never felt the shower water.

-16-

I was the transport officer who took Watkins to Physician Assistant Costello.  He wrote a prescription for Watkins for a 2100 calorie a day diet.  A 3200 calorie a day diet is provided all inmates.

Watkins never provided any documentation showing that he was diabetic.  However, when he came into the jail, he claimed he was diabetic.

We were only supposed to hold nine inmates.  We had sixteen beds and had six other boats.

I never saw Watkins' grievance of July 24th.  In late July or early August, Watkins asked me if he could be transferred.  I said he could be.  When I came back and said he could be transported to Sheridan, he said he didn't want to go because of his diet.  Sheridan does feed less than we do. I have personally witnessed their feeding.

I asked him twice because he was fussing and carrying on.  He said he didn't like the food in Sheridan.

### Michael Shane Taylor

I was a detention officer at the HSCJ from June 20, 2007, until September of 2007.  I had very little contact with Watkins.

I don't recall him asking to be transferred.  I probably would recall that.

There was an occasional plumbing problem caused by an inmate putting excess paper in the toilet etc.  It was usually fixed within a couple of hours.  Most of the time the toilets worked properly.

I didn't receive a single complaint about the temperature of the water in the shower.  When I did jail checks, I would see inmates in the shower underneath the water.  The shower curtain would be open.  It wasn't my business why the inmate left the shower curtain open.

I don't recall Watkins' grievance form.  I remember making copies for him but don't recall if one was a grievance form.

I saw inmates doing jumping jacks, sit-ups, etc.  I recall inmates having to sleep on the floor. There were eight bunks on each side.

Inmates received their water in milk jugs through the bars.  They got water whenever they requested it.

I ate the food there almost everyday.  Lots of people ate it.

There were loose wires.  The wires were insulated.  They were not bare wires.

There were air conditioners and heating units on both sides.  The temperature could be controlled.

## 2.  Discussion

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.). Keeping these principles in mind, I turn to an examination of the conditions of confinement alleged to exist in this case.

**(A). Diet Inadequate to Maintain Health**

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). To prevail on an Eighth Amendment

claim Watkins must show the Defendants were deliberately indifferent to his dietary needs. *Wishon v. Gammon*, 978 F.2d 446 (8th Cir. 1992).

Merely because the food is served is not prepared to an inmate's taste does not implicate the Eighth Amendment.  Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health.  *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food).  *See also Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)(the deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities).

Watkins maintains the diet he was provided was not the 2100 calorie diabetic diet specified by PA Costello.  However, his claim is based solely on the fact that he received the same food as the other inmates.  He did not identify a single way in which the diet varied from the one he should have been receiving.  In fact, he testified he did not know what the American Diabetes Association diet consisted of.  He did not establish he would have received less than 2100 calories a day if he only ate the food on his tray that was appropriate for a diabetic to eat.  Further, and importantly, he has submitted no evidence or testimony suggesting the diet he received adversely impacted his health.

Watkins also contends the food was served in an unsanitary manner.  However, Watkins suffered no physical injury as a result of the diet he received and his health was not endangered because of the manner in which the food was prepared or served.  Thus, no claim of constitutional dimension is stated.

**(B) Sanitation**

With respect to sanitation, the Eighth Circuit has stated that "[w]hile reviewing the totality of circumstances" of the plaintiff's confinement, we must "focus on the length of his exposure to unsanitary conditions and how unsanitary the conditions were." *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003)(Defendant not entitled to judgment as a matter of law where detainee slept next to a toilet for five weeks).

The testimony indicates the jail was old and the equipment and facilities were outdated. However, there was no evidence that Watkins was exposed to disease or suffered any other consequences from exposure to the alleged uncleanliness of his cell. The evidence established that detainees were offered the opportunity to clean the cell, day-room, and shower by the 309's. The testimony indicated that when the plumbing was stopped up or overflowed it was cleaned up and unstopped.

**(C). Overcrowding**

"[O]vercrowding alone is insufficient to create a due process violation." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995). Here, Watkins has not shown that the "overcrowding led to deprivations of essential food, medical care, or sanitation." *Patchette v. Nix*, 952 F.2d 158, 162 (8th Cir. 1991)(*citing Cody v. Hillard*, 830 F.2d 912, 914 (8th Cir. 1987)).

While there were days when Watkins was at the HSCJ that the population exceeded nine inmates, there were very few days when the population exceeded sixteen, the number of beds available at the facility. *See Plff's Ex.* 4 (June 20-June 30, 2007, population varied between 13 & 16 detainees (16 on only one day); July 1-July 30, 2007, population varied between 4 & 17 detainees (16 or above on only 4 days); August 1-August 30, 2007, population varied between 8 & 19 (16 or

above on only 2 days); September 1-September 6, 2007, population varied between  7 & 11).
Furthermore, Watkins testified he always had a mattress or bunk to sleep on.  He had access to a day-
room, was able to shower and keep his body clean, and his basic human needs for food, clothing, and
shelter were met.  A *de minimis* level of imposition does not rise to the level of a constitutional
violation.  *Bell v. Wolfish*, 441 U.S. 520, 539 n. 21, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).  *See
also Wilson v. Seiter*, 501 U.S. 294, 305-05, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)("Nothing so
amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no
specific deprivation of a single human need exists.").

**(D).  Opportunities for Exercise**

A constitutional violation exists if prison officials are deliberately indifferent to an inmate's
exercise needs.  *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).  A "lack of exercise may
be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is
threatened."  *Id.*  Among factors the court should consider in reviewing such a claim are:  (1) the
opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the
cell; and (4) the duration of confinement.  *Id.*

Watkins contends there was inadequate room to do exercises such as push-ups or sit-ups.
Watkins had access to both the cell and the day-room.  While he was not provided with access to an
exercise area outside the jail, he was not locked in his cell.  According to the jail logs Watkins
submitted, *Plff's Ex.* 4, at no time during his initial stay at the HSCJ, June 20 to July 2, did the jail
population exceed sixteen detainees–the number of beds available–eight per side.  The day-room was
sixteen feet by eleven feet in size.

Other individuals incarcerated there at the same time as Watkins testified they either exercised, saw people exercising, or could have exercised if they had wanted to. For instance, Kimzey Harper testified he saw people exercising, doing jumping jacks, etc. He also testified he could have exercised but did not. Similarly, Richard Harper testified you could do sit-ups or pull-ups if you didn't mind getting on the dirty floor.

In contrast McGuire testified that there were ususally twelve inmates on one side and up to fourteen on the other side, and there was not enough area with this many inmates to exercise. McCauley testified there wasn't room to exercise if there was anyone at the table. If you were by yourself, he testified you could exercise. No one testified they saw Watkins attempting unsuccessfully to exercise.

This does not demonstrate a deprivation serious enough to violate the Eighth Amendment. *See e.g., Rahman X v. Morgan*, 300 F.3d 970, 974 (8th Cir. 2002); *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003)(thirty-seven days without being allowed to exercise did not constitute an atypical and significant hardship in the context of normal prison life); *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001)("short-term denials of exercise may be inevitable in the prison context."); *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective custody). Additionally, there is no indication Watkins suffered any physical injury as a result of the lack of exercise.

-23-

### (E).  Hot Showers/Inadequate Plumbing

Watkins testified that the shower only had hot water and the floor drain frequently was clogged.  He also testified the toilet only half flushed.  His testimony regarding the temperature of the shower water was supported by McGuire, McCauley, and Kimzey Harper.  Richard Harper testified when he showered the water would either be too cold or too hot.  Whitney Bishop testified the water in the shower was normally scalding hot.  If the 309's attempted to turn the temperature down, it was too cold when the water first came on.  McGuire also testified he knew of two separate occasions when the jail cells were flooded from the toilet.  Kimzey Harper testified the plumbing stopped up when they took showers but would remedy itself by the end of the day.

Although the water from the shower was hot, Watkins was able to keep himself clean.  He sometimes just got his towel wet and cleaned himself with his towel and soap rather than getting under the hot water.  The excess water or overflows were cleaned up or repaired by inmates, 309's or plumbers were called.

"[E]xtreme deprivations are required to make out a conditions-of-confinement claim" under the Eighth Amendment.  *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).  Under the standards applicable, I cannot say Watkins has established by a preponderance of the evidence that he suffered an extreme deprivation.

### (F).  Insufficient Staffing

Watkins contends his rights were violated by the inadequate level of staffing.  He maintains there was usually only one jailer on duty.  Watkins did not establish that he was harmed because of the under-staffing but he maintains he could have been harmed had a fire broken out and the inmates needed to be evacuated or some similar emergency arose.

-24-

At most, Watkins has shown that the HSCJ officials may have acting unreasonably in failing to take measures to improve or increase the staffing at the facility. However, this does not rise to the level of deliberate indifference to Watkins' safety. *See e.g., Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005)(allegations regarding inadequate records, overcrowding, poor supervision, and under-staffing showed at most that officials were negligent, which did not rise to level of deliberate indifference).

**(G).  No Fire Safety Measures**

Watkins maintains the facility had no fire escape plan, no fire extinguishers, and the fire escape ladder did not go all the way to the ground. He also maintains there was normally only one jailer on duty and it took two jailers to open the door leading to the cells.

Cases have held that fire safety deficiencies can be so serious that they become constitutional violations. *See Hadix v. Johnson*, 367 F.3d 513, 528-530 (6th Cir. 2004)(discussing cases). The court in *Hadix* noted that a review of the "cases dealing with fire safety in the constitutional context illustrates a continuum of various violations of fire safety, generally, and fire safety codes, specifically." *Id.* at 529. The cases where constitutional deficiencies have been found to exist were cases where the risk of fire was found to be so serious that it violated contemporary standards of decency. The facts present in those cases included, among other things, the following: overcrowded dormitories carrying a heavy combustible load; walls that could not contain a fire within any room; inoperable cell locking devices, manual alarm systems, smoke dampers, and heat detectors; the facility was replete with fire hazards; evacuation procedures were nonexistent; and evidence of multiple fire related injuries and/or fatalities.

There were no fires while Watkins was detained at the facility.  He was never physically harmed.  There was no testimony indicating there was a heavy combustible load or any specific fire hazards.  Watkins advanced no specific factors suggesting that there was any serious risk of harm to him or other inmates.  *See also* Doc. 59 at page 14 (fire alarms work and are up to code).  We therefore conclude Defendants are entitled judgment in their favor on this claim.

**(H) Violation of Jail Standards**

Watkins pointed out that the HSCJ violated the Arkansas jail standards in a variety of ways.  *See e.g., Plff's Ex.* 7.  A violation of jail standards does not equate with a violation of the Constitution.  As the Eighth Circuit said in *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991), "[j]ail standards, although helpful and relevant in some cases, do not represent minimum constitutional standards."

## 3.  Conclusion

I therefore recommend that judgment be entered in favor of the Defendants and the case be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **29th day of July 2009.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

-26-